No. 12889

IN THE SUPREME COURT OF THE STATE OF MONTANA

1975

---

MONTANA BOARD OF NATURAL RESOURCES AND CONSERVATION and
JOSEPH W. SABOL, Chairman, OWEN E. SOWERWINE, DR. WILSON F.
CLARK, DEAN HANSON, RILEY OSTBY, CECIL WEEDING and DAVID
G. DRUM, as Members of the BOARD OF NATURAL RESOURCES AND
CONSERVATION and the MONTANA DEPARTMENT OF NAUTRAL RESOURCES
AND CONSERVATION and GARY J. WICKS, DIRECTOR OF THE MONTANA
DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION,

Plaintiffs and Appellants,

-vs-

THE MONTANA POWER COMPANY, a Corporation,

Defendant and Respondent.

---

Appeal from:  District Court of the First Judicial District,
Honorable Peter Meloy, Judge presiding.

Counsel of Record:

For Appellants:

Doney, MacIntyre and Chronister, Helena, Montana
Donald D. MacIntyre argued, Helena, Montana
Robert T. Cummins argued, Helena, Montana

For Respondent:

Thomas Kelly argued, Billings, Montana
William Coldiron appeared and John Carl appeared,
Butte, Montana

---

Submitted:  December 4, 1974

Decided:  MAR 3 1 1975

Filed: MAR 3 1 1975

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal by the Montana Board of Natural Resources and Conservation from a judgment of the district court, Lewis and Clark County. The presiding judge Honorable Peter G. Meloy held the Montana Power Company exempt from section 70-811(3), R.C.M. 1947.

This matter was first before this Court in an original proceeding, Montana Board of Natural Resources v. The Montana Power Co., 31 St.Rep.930.

The Board of Natural Resources and Conservation (hereinafter referred to as the Board) found that the Montana Power Company (hereinafter referred to as the Power Company) must obtain a certificate under the provisions of the Montana Utility Siting Act of 1973, sections 70-801 through 70-823, R.C.M. 1947, to construct a transmission line from Billings to Great Falls,Montana. The Board first went to the district court and obtained a temporary restraining order enjoining the Power Company from constructing the line. The trial court found the Power Company had commenced construction before January 1, 1973, and entered judgment for the Power Company declaring it exempt from the provisions of section 70-811(3), R.C.M. 1947, and no certificate was required.

That ruling was appealed to this Court asking that the temporary restraining order be reinstated. After hearing, this Court denied that request. The Board now appeals from the judgment of the district court declaring the Power Company exempt from section 70-811(3) and seeks a declaration by this Court that a certificate of environmental compatibility and public need is required.

The sole issue on appeal is whether the Billings-Great Falls 230 KV utility facility was under construction on January 1, 1973.

The Power Company is engaged in the production and distribution of electrical energy in Montana. At a hearing before the trial court it was established by uncontradicted evidence that for much of the period of its existence it has relied entirely upon water power for

the generation of its electricity and only in recent years has the Power Company turned to other forms of power generation. Because of the rapid increase in demand for electricity in its service area in recent years and the problems caused by low water and severe winter freezing that have arisen because of its dependence upon water power, the Power Company was faced with brown-out conditions unless improvements were made. For example: In the Billings service area there was a 69% increase in demand from 1969 to 1972; in the Great Falls service area a 43% increase; and in the Butte-Helena service area a 19% increase. It was obvious in the late 1960s that the demands of the Power Company's customers were straining the capacity of its existing transmission lines and that the future demands would be greater than the Company could handle on its existing lines.

To meet this increasing demand, the Power Company began building a 230 KV transmission line loop, which when finished would encircle Butte, Anaconda, Helena, Great Falls and Billings and towns serviced within that loop. In addition, the Power Company built a steam production plant in Billings and is in the process of completing two energy production plants in Colstrip, Montana, which are due to go into production in the years 1975 and 1976. One of the principal reasons for the construction of the loop is to be able to rapidly transfer energy to where it is needed and thus have a constant available source regardless of weather or other factors.

As a final part of the completion of the loop, the Power Company in 1968-69 constructed 18 steel towers (about three miles), running north from the Corette Generating Plant in Billings to the vicinity of Alkali Creek. Tower No. 18 was to serve as a junction to the line going north to Great Falls and the line going west to Butte-Anaconda. From tower No. 18 to Great Falls it is approximately 180 miles and since the completion of tower No. 18 in 1969 the Power Company has acquired some 117 miles of right-of-way and is involved in, or has completed, several condemnation actions for the remainder.

In addition, a number of administrative matters have occurred concerning the line. Cost estimates have been made for budgetary purposes; some of the wooden poles, known as "H Structures", have been ordered and many have been delivered to specified sites; insulators have been ordered and delivered; an engineering firm, referred to as MAIN-STR was hired and has made an environmental impact study of the area between Great Falls and Billings and has made a report on a preferred route; and, contracts were let in early 1974 to the Montana Line Contractors Association for the sum of $1,600,000 to finish the line.

In 1973, the 43rd legislature passed what is known as the Montana Utility Siting Act, effective March 16, 1973, to be administered by the Board. Shortly after the passage of the Act officials of the Power Company met with the Board to discuss how the Act would affect a number of its projects and to also give the Board a long range construction plan of the Power Company. At this meeting, held March 16, 1973, the Power Company gave the Board a memorandum which purported to specify the projects that it had under construction and those that it intended to apply for certificates for, under the new Act.

The Billings-Great Falls 230 KV line was not listed as under construction but was listed as a project for which a certificate would be applied for. On May 11, 1973, the Power Company applied for such a certificate and paid an application fee of $90,250 as an estimate on the total cost of $7,025,000. The cost to build the 18 towers, a sum of $300,000, was not included. As a result of the filing for the certificate the Board began its environmental studies, but as of the time of the filing of this cause the certificate had neither been granted nor denied.

Approximately one year after filing its application for a certificate the Power Company determined the Billings-Great Falls line certificate should not have been requested due to the fact that under the Siting Act that line was under construction prior to January 1, 1973.

The Board argues the Power Company is estopped, even though the project was under construction prior to January 1, 1973, by reason of having represented to the Board that the line was not under construction as of January 1, 1973, and therefore, having applied and paid the fee for a certificate, the Board in reliance upon that representation by the Power Company acted to its detriment. The Board further argues this Court should interpret sections 70-804 and 70-811(3), R.C.M. 1947, to require a certificate for the Great Falls-Billings facility.

The two sections of the Siting Act involved provide in pertinent part:

> "70-804, R.C.M. 1947. No person shall commence to construct a utility facility in the state without first having obtained a certificate issued with respect to such facility by the board. * * *"

> "70-811(3), R.C.M. 1947. * * * A certificate is not required under this act for facilities under construction or in operation on January 1, 1973. However, a certificate must be obtained for associated facilities upon which construction has not commenced before January 1, 1973 * * *."

Before discussing the two statutes we note that prior to this three district judges have rejected the interpretation urged by the Board. Our task is to construe what the legislature intended by the words "facilities under construction * * * on January 1, 1973" as they appear in section 70-811(3), R.C.M. 1947.

This Court has long established set rules of construction to be followed in ascertaining and interpreting legislative purpose and intent. In 1921, in Wilkinson v. La Combe, 59 Mont. 518, 522, 197 P. 836, this Court held:

> "Of two admissible constructions, the courts are never justified in adopting the one which defeats the manifest object of the statute involved * * *."

In 1948, in State Board of Equalization v. Cole, 122 Mont. 9, 20, 195 P.2d 989, the Court said:

> "Statutes 'should be so construed as to give a sensible and intelligent meaning to every part and avoid absurd and unjust consequences. Section 516, Lewis' Sutherland Stat.Const.(2d Ed.)' State v. Redmond, 73 Mont. 376, 380, 237 Pac. 486, 488."

In re Estate of Marans, 143 Mont. 388, 395, 390 P.2d 443 (1964), the Court said:

> "* * * In short, we do not impute to the legislature the intent to give and take away in one statutory pronouncement."

See also: Helena Valley Irrigation District v. State Highway Comm'n, 150 Mont. 192, 433 P.2d 791 (1967); State v. Holmes, 114 Mont. 372, 376, 136 P.2d 220 (1943).

The very reading of section 70-811(3), "A certificate is not required under the act for facilities under construction or in operation on January 1, 1973." indicates the legislature was aware that on some construction projects work was underway and this work begun before January 1, 1973 was to be excluded or exempt.

Here, there is no dispute that work had been done in 1968 on the beginning of the Billings-Great Falls line; 18 towers were built from the point of power generation to a point some 3 miles to the north. In 1969, the steel static wire, a part of the line, was placed on the 18 towers. Other acts followed which are considered "construction" such as the ordering of the H poles, a very special item that takes considerable time to obtain and which comes from several rather than one bidder; the stockpiling of the poles near the construction sites; the budgeting for and obtaining of wire; the purchase of much of the right-of-way; and, the letting of the environmental study contract.

While the obtaining of "right-of-way" by condemnation action was not a factor to be considered in determining the "facilities under construction" it is of interest that the 1974 legislature amended section 70-803, R.C.M. 1947, to include a definition of the phrase "commence to construct". Subsection (5)(a) of that section provides:

> "any clearing of land, excavation, construction, or other action that would affect the environment of the site or route of a utility facility, but do not include changes needed for temporary use of sites or routes for nonutility purposes, or uses in securing geological data, including necessary borings to ascertain foundation conditions. The words do include the commencement of eminent domain proceedings under Title 93, chapter 99, R.C.M. 1947, for land or rights of way upon which a utility facility may be constructed." (Emphasis supplied).

The Board argues that the word "construction" is not defined in the Act as passed, therefore, the Court must look to the restrictions placed on the word or phrase to ascertain the intent of the legislature as the the word "construction". Further, that we must carefully look to modifying words and the general legislative setting in which the word and the modifying words appear. It further argues that the phrasing of section 70-811(3), R.C.M. 1947, is narrow and restrictive, that is, that the facility must be under construction on January 1, 1973.

The Board further argues that all the condemnation actions filed by the Power Company were instituted prior to the 1974 amendment to section 70-803 and it is not applicable here; and that we must look to the law as it stood at the time the eminent domain proceedings were instituted. We agree.

Here, land was cleared, excavation and construction of the 18 towers affecting the environment of the site and route had begun. We find there was a commencement of construction prior to January 1, 1973.

We do not find, as the Board argues, that the filing of the application and paying the $90,250 filing fee puts the Power Company in such an inconsistent position as to bring the case within the doctrine of equitable estoppel. In effect, what the Board argues is that failure of the Power Company to list the Billings-Great Falls line as one under construction and in requesting a certificate, the Power Company's later position that the project was under construction gave jurisdiction to the Board to act. Not so! Jurisdiction cannot be acquired by estoppel. 73 C.J.S., Public Administrative Bodies and Procedure § 116, p. 435:

> "A public administrative body has such adjudicatory jurisdiction as is conferred on it by statute. It may not acquire jurisdiction by estoppel or consent, and, where it acts without jurisdiction, its orders are void. * * *"

See: 2 Am Jur 2d Administrative Law, § 331, p. 152; Grubb v. Public Utilities Commission of Ohio, 50 Sup.Ct. 374, 281 U.S.

- 7 -

470, 74 L ed. 972; Springfield Community School Dist. v. Iowa Dept. of Pub. Inst., 252 Iowa 907, 109 N.W.2d 213; Rosenberry v. Gillan Bros., 130 Pa.Super. 469, 197 A. 523.

The judgment of the district court is affirmed.

_____
Justice.

We Concur:

_____
Chief Justice

_____

_____

_____
Justices.